**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

GREAT AMERICAN ASSURANCE
COMPANY,

        Plaintiff,

vs.                                                          Case No. 3:09-cv-77-J-32TEM

DOUGLAS ELLIOTT, MARY ANN HOOPER
and WILLIAM ROBERT ELLIOTT,

        Defendants.

## **ORDER**

This case presents the question of whether a farm insurance policy for bodily injury and property damage requires the insurer to indemnify its insured against a civil judgment that arose from the insured dismembering his mother's dead body with an axe, setting parts of her body on fire, and then distributing her remains on the family farm. The Court answers this question "no."

**I.    Procedural History**

Plaintiff Great American Assurance Company filed this action seeking a declaration that the Agripak Farm and Ranch Policy ("the Policy") it issued to Martha Elizabeth Elliott ("Mrs. Elliott" or "the Mother") did not require Great American to defend or indemnify her son, William Robert Elliott ("William"), an additional insured under the Policy, in a civil suit brought against William by his siblings, Douglas Elliott ("Douglas") and Mary Ann Hooper ("Hooper") for claims related to William's actions in disposing of their mother's body. See Doc. 1. Great American has moved for summary judgment, claiming that the allegations in the civil suit

against William did not trigger either a duty to defend or a duty to indemnify under the terms of the Policy. Doc 14. At the time Great American filed its motion for summary judgment, William had recently been convicted and sentenced in Suwannee County, Florida of first degree murder of his mother, abuse of her dead body, and tampering with evidence. Doc. 14, Ex. A. Douglas and Hooper filed a response to the first motion for summary judgment (Doc. 19), Great American filed a reply (Doc. 25) and Douglas and Hooper filed a sur-reply (Doc. 31).

While the parties were filing their papers relating to the first motion for summary judgment, the underlying civil suit was proceeding in Suwannee County. Great American had provided counsel for William under a reservation of rights and had itself moved to intervene for the limited purpose of securing a stay of the civil action until this declaratory judgment action could be decided. The Suwannee County court, however, denied the motion to stay,[1] and the trial went forward as scheduled. On August 20, 2009, the jury rendered a verdict finding William liable to Douglas and Hooper for negligent infliction of emotional distress, negligent handling of a corpse, and diminution of property value, assessing total damages of $1,100,000.00. Great American then filed a second motion for summary judgment seeking a determination that the policy does not provide a duty to indemnify William for any of the claims or damages upon which William was adjudicated liable. Doc. 42. Douglas and Hooper filed a response in opposition (Doc. 47), Great American filed a reply (Doc. 51) and the Court conducted oral argument on the pending

---

[1] The import of that ruling, debated by the parties, is discussed below.

motions, the record of which is incorporated by reference (Doc. 75).[2] After learning that the underlying civil and criminal convictions were then on appeal in state court, the Court stayed consideration pending a final resolution of the appeals. Doc. 62.

William's criminal conviction was affirmed on appeal (Doc. 67-1), and the civil judgment was affirmed in part and reversed in part (Doc. 67-2). The judgment was affirmed on the causes of action for negligent handling of a corpse and negligent diminution of value to inherited real property, but reversed on the claims for negligent infliction of emotional distress. Doc. 67-2. The jury had awarded $600,000 for negligent infliction of emotion distress; thus $500,000 of the jury's original $1,100,000 verdict ($400,000 for negligent handling of a corpse and $100,000 for negligent diminution in property value) was upheld on appeal.

Defendants Douglas and Hooper then filed a motion asking the Court to proceed with its consideration of the pending motions for summary judgment in this case. Doc. 70. This motion was unopposed by Great American.[3] The parties subsequently filed supplemental memoranda regarding the impact of the state appellate decisions on this case. See Docs. 73, 74.

**II.      Applicable Principles of Law**

"Summary judgment is appropriate in declaratory judgment actions seeking a

---

[2] William, who is incarcerated and proceeding pro se in this action, filed an answer (Doc. 10) and participated in the hearing by telephone, but has not otherwise been active in the case.

[3] However, William has indicated that he does not wish the Court to rule at this time. See Doc. 72.

3

declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." Northland Cas. Co. v. HBE Corp., 160 F.Supp. 2d 1348, 1358 (M.D. Fla. 2001) (citation omitted). The parties agree that Florida law governs the interpretation of the insurance policy at issue. Under Florida law, "[w]hen assessing an insurance dispute, the insured has the burden of proving that a claim against it is covered by the policy, and the insurer has the burden of proving an exclusion to coverage." Key Custom Homes, Inc. v. Mid-Continent Cas. Co., 450 F.Supp.2d 1311, 1316 (M.D. Fla. 2006) (citations omitted). "[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." United States Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007). "Insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage." Id. (citations omitted).

### III. Discussion

The parties first dispute whether Douglas and Hooper's claims against William in the underlying civil case are covered claims under the terms of the Policy.[4] The Policy provides coverage only for bodily injury and property damage liability caused by an "occurrence,"

---

[4] Douglas and Hooper also argue that Great American waived the right to contest coverage in this case because it failed to comply with the Florida claims administration statute, Fla. Stat. § 627.426(2). The Florida Supreme Court, however, has held that an insurer's "failure to comply with the requirements of the statute will not bar an insurer from disclaiming liability where . . . the coverage sought is expressly excluded or otherwise unavailable under the policy or under existing law." AIU Ins. Co. v. Block Marina Investment, Inc., 544 So.2d 998, 1000 (Fla. 1989). The Florida claims administration statute is thus not relevant to Great American's claims that William's liability is not covered under the terms of the Policy or is subject to a Policy exclusion.

4

which is defined as an "accident."[5]  Under Florida law, "where the term 'accident' in a liability

---

[5] The entire Policy is attached to Great American's Complaint.  See Doc. 1, Ex. B.  The Policy provisions addressed in this Order, as contained in the "Agripak Farm and Ranch Policy Farm Liability Coverage Form" section of the Policy are as follows:

> **SECTION I – COVERAGES**
>
> **COVERAGE H. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1.  Insuring Agreement**
>    **a.**  We will pay those sums that the "Insured" becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the "Insured" against any "suit" seeking those damages.  However, we have no duty to defend any "Insured" against a "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
>
>    . . . .
>
>    **b.**  This insurance applies to "bodily injury" or "property damage" only if:
>    **(1)**  The "bodily injury" or "property damage" is caused by an "occurrence" . . .
>
>    . . . .
>
> **2.  Exclusions**
>    This insurance does not apply to:
>    **a.  Expected Or Intended Injury**
>    "Bodily Injury" or "property damage" expected or intended from the standpoint of the "insured," even if the resulting "bodily injury" or "property damage:"
>
>    (1)  Is of a different kind, quality, or degree than initially expected or intended; or
>    (2)  Is sustained by a different person,

5

policy is not defined, the term, being susceptible to varying interpretations, encompasses not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured." State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998). "In many cases the question of whether the injury or damages were unintended or unexpected will be a question of fact; in some cases, the question will be decided as a matter of law, such as in cases where the insured's actions were so inherently dangerous or harmful that injury was sure to follow." Id.

When determining whether Great American has a duty to indemnify under the terms

---

entity, real or personal property, than initially expected or intended.

. . . .

**SECTION VI – DEFINITIONS**

. . . .

3. "**Bodily injury**" means physical injury, sickness, or disease, sustained by a person, including death of that person resulting from any of these at any time. "Bodily injury" also means mental injury, mental anguish, humiliation, or shock sustained by a person, if directly resulting from physical injury, sickness, or disease to that person.

. . . .

19. "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

23. "**Property damage**" means:
    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

6

of the Policy,[6] the Court considers the facts of the underlying case and is not bound by the allegations of the complaint. Hagen v. Aetna Cas. & Sur. Co., 675 So. 2d 963, 964 (Fla. 5th DCA 1996); see also Am. Home Assur. Co. v. Vreeland, No. 8:05-cv-2250-T-30MSS, 2006 WL 1037111, at *1 (M.D. Fla. Apr. 19, 2006)("[U]nder Florida law an insurer's duty to indemnify is determined by analyzing the policy coverages in light of the actual facts of the underlying case."). There is no dispute that William intentionally dismembered his mother's dead body, set other parts of her body on fire, and then distributed her remains on the family farm. In fact, William was convicted of first-degree murder, meaning that his actions were premeditated. The Court therefore must determine whether William "expected or intended to cause damage" to Douglas and Hooper through this conduct.

Douglas and Hooper argue that the jury's finding of negligence in the Suwannee suit implies that William did not intend to cause them harm. They further argue that, even if the jury's verdict is ignored, there is no direct evidence that William intended to harm *them*, as opposed to their mother. Doc. 47 at 2.

The jury verdict in the underlying case, however, does not specifically address whether William intended or expected to cause Douglas and Hooper harm.[7] In fact, the

---

[6] Because all appeals in the civil case has been exhausted, the Court need not address whether Great American had a duty to defend William in the underlying suit. Great American's defense of William at the trial level was provided under a reservation of rights, and thus Great American could theoretically seek reimbursement of some or all of those costs if it had no duty to defend the case. However, Great American has not suggested that it is interested in such recourse or otherwise argued that it remains interested in this issue.

[7] The jury first found "*negligent* handling of a corpse by Defendant, William Robert Elliott, which proximately caused damages." Doc. 73 at 13. Second, the jury found that "Bill Elliott

7

issue of intent was never raised at trial. Great American was not a party, and neither party had any incentive to argue that William intentionally injured Douglas and Hooper.[8] However, even if the verdict had addressed the issue of intent, when the interests of an insurance company are antagonistic to those of the parties, the insurance company is "not . . . bound by the factual determinations made during" the underlying litigation. Ins. Co. of N. Am. v. Whatley, 558 So.2d 120, 122 (Fla. 5th DCA 1990); see also Britamco Underwriters, Inc. v. Cent. Jersey Invs., Inc., 632 So.2d 138, 140 (Fla. 5th DCA 1994)("Clearly, the insurer is not a party to the underlying . . . action and the insurer is not bound by the factual determinations made in the underlying liability lawsuit to which they are not a party, since the interests of the insured and the insurer are antagonistic towards each other in an initial tort adjudication where the issue of coverage is disputed."); Arnett v. Mid-Continent Cas. Co., No. 8:08-cv-2373-T-27EAJ, 2010 WL 2821981, at *7 (M.D. Fla. 2010)("Generally, an insurer cannot relitigate fact issues in a subsequent coverage action because it was in privity with the

---

was *negligent* in the handling or disposal of the remains of Martha Elliott" and that this "*negligence* . . . caused the subject property to be tainted and stigmatized, thereby diminishing the market value of the property." Id. Negligence, of course, is the failure to use reasonable care. The jury therefore found that William caused Douglas and Hooper harm by failing to use reasonable care when handling their mother's body. There is nothing in this finding that is inconsistent with William having intended or expected to cause them harm. Moreover, at oral argument, Douglas and Hooper admitted that the jury's verdict does not resolve the issue of intent. See Doc. 75 at 47.

[8] Douglas and Hooper knew that to collect on a judgment they would need to keep the claim within the boundaries of negligence, and the defense for William wanted to minimize his conduct to shield him from liability to the greatest extent possible. Even if it would have had the opportunity to do so, Great American thus would not have been able to argue to the jury that William's actions were intentional without prejudicing his interests that it was defending. Moreover, with no evidence on the intent issue, special interrogatories would have been at best confusing for the jury and, at worst, prejudicial to William's defense.

8

insured in the underlying case. However, an exception to the 'privity' doctrine arises where the interests of the insured and insurer are antagonistic towards each other in an initial tort adjudication.) (internal citations and quotations omitted).[9] Thus, although the jury found William liable under theories of negligence, these findings do not control this Court's coverage determination of whether William intended or expected to injure Douglas and Hooper.[10]

The Court also rejects Douglas and Hooper's contention that, to show that their damages were not caused by an "occurrence," Great American must advance direct evidence that William had the specific intent to cause them harm. Douglas and Hooper rely primarily on the Florida Supreme Court's decision in CTC Development, which holds that tort principles do not apply to the insurance definition of an "occurrence." Because tort principles do not apply, an injury may be accidental (and thus constitute an "occurrence") even if the injury was "reasonably foreseeable" or a "natural and probable consequence." In other

---

[9] This line of cases also addresses Douglas' and Hooper's argument that, because Great American intervened in the underlying case and defended William under a reservation of rights, it had a legal duty to resolve any ambiguity in the jury's verdict by submitting a verdict form that would have conclusively established whether William intended to cause them harm. Because Great American's interests were antagonistic to those of William, its insured, it was under no obligation to place the issue of intent before the jury. Moreover, Great American was not a party to the litigation, as it had intervened only for the limited purpose of seeking to stay the action, and thus it did not have an opportunity to submit a proposed verdict form. The cases cited by Douglas and Hooper are inapposite because they do not involve such antagonistic interests and limited intervention. See Herrera v. C.A. Seguros Catatumbo, 844 So.2d 664 (Fla. 3d DCA 2003); U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061 (Fla. 1983).

[10] As explained above, however, even if the Court were to apply the jury's findings, doing so would not necessarily resolve the issue. See supra note 7.

words, under CTC Development, to show that Douglas and Hooper's damages are not covered under the Policy, Great American must show that William acted with the actual intent or expectation to cause them harm; therefore, it would not be enough for Great American to show that harm *should have been* intended or expected under an objective standard.[11]

The court in CTC Development, however, also stated that a court may infer as a matter of law an intent or expectation to cause harm "in cases where the insured's actions were so inherently dangerous or harmful that injury was sure to follow." 720 So.2d at 1076. Thus, direct evidence of the insured's state of mind is not always required because, in some cases, intent can be inferred from the nature of the insured's actions.[12]

For example, in Landis v. Allstate Ins. Co., 546 So.2d 1051 (Fla. 1989), an insurance company brought a declaratory judgment action against a defendant who was alleged to have sexually abused children. Although the defendant argued that her diminished mental capacity prevented her from forming the specific intent to harm the children, the court held that "harm always results from sexual abuse[,] so that any intent to commit abuse

---

[11] Douglas and Hooper also rely on the court's statement that coverage is "provided not only for an accidental event, but also for the unexpected injury or damage resulting from the insured's intentional acts." CTC Development, 720 So.2d at 1075-76. The court in CTC Development, however, was merely recognizing that "[m]ost negligent acts begin with an intention to do what the actor was doing when the accident occurs." Brown v. Travelers Ins. Co., 641 So.2d 916, 921 (Fla. 4th DCA 1994). Thus, for example, even a car accident results from the intentional act of driving a car.

[12] While Douglas and Hooper correctly assert that "there can be no 'constructive intent' imputed to the insured," (Doc. 73 at 7), "actual intent" can be established from the circumstances of the insured's actions.

10

necessarily carries with it an intent to commit harm." State Farm Fire & Cas. Co., 720 So.2d at 1076 (summarizing Landis).[13] The court explained that direct evidence of the insured's subjective state of mind is not necessary when "injury inheres in and inevitably flows from" the conduct at issue, such that "the act and the harm cannot be separated." Travelers Indemnity Co. v. PCR Inc., 889 So.2d 779, 793 (Fla. 2004) (discussing Landis).

Admittedly, this case is not identical to Landis. Unlike the insured in Landis, William did not directly cause physical harm to Douglas and Hooper. However, the Court finds that harm to a son or daughter necessarily results when a sibling mutilates, ingests, and improperly disposes of their mother's corpse. In other words, "the act and the harm cannot be separated," id., because William's actions "were so inherently dangerous or harmful that injury was sure to follow," CTC Development, 720 So.2d at 1076. William's intent to dismember his mother's dead body and distribute her remains over the family property thus necessarily carries with it as a matter of law an inferred intent to harm Douglas and Hooper.

Other cases have likewise found that, if an insured intentionally causes physical injury to another, and this injury results in harm to a family member (such as emotional distress or loss of consortium), the harm to the family member is not "accidental," as that term is used in an insurance contract. In Hatmaker v. Liberty Mutual Fire Insurance Co., 308 F. Supp.2d 1308 (M.D. Fla. 2004), for example, Robert Hatmaker suffered serious physical injuries during an altercation with the insured. He then brought suit for assault, battery, and

---

[13] Similarly, in the court in State Farm Fire and Casualty Company v. Tippett, 864 So.2d 31, 36 (Fla. 4th DCA 2003), held that the policy in question did "not provide insurance coverage for 'negligent rape' or sexual assault of an incapacitated adult" because harm to the plaintiff was clearly intended or expected.

11

negligence, and his wife, also a plaintiff in the suit, brought a claim for loss of consortium. The parties ultimately entered into a settlement agreement that apportioned a specific amount to the wife's claim for loss of consortium. The court in Hatmaker held that the damages awarded in the settlement, including the damages for the wife's consortium claim, were not covered under the insured's homeowner's policy because they resulted from the insured's intentional harming of Hatmaker. Although the court did not discuss this issue, it did not require the insurance company to prove that the insured had the specific intent to cause harm to Hatmaker's wife. See also Reyes v. State Farm Fla. Ins. Co., 943 So.2d 237 (Fla. 3d DCA 2006)(finding that the plaintiff's claims for wrongful death and negligent infliction of emotional distress would not be covered under the policy if the defendant had intentionally shot the plaintiff's spouse). Similarly, in this case Great American is not required to present direct evidence that William had the subjective intention to harm his siblings when he murdered their mother and mutilated her body.

In sum, although there is no Florida case directly on point, the import of these cases is that, because William intentionally killed his mother and mutilated her corpse, it can be inferred as a matter of law that he intended or expected to cause harm to his siblings. Because this was no "accident," Douglas and Hooper's damages in the underlying case were not caused by an "occurrence." Great American thus has no duty to indemnify William.[14]

---

[14] The Court further finds that there is no coverage under the Policy because the underlying case does not award damages for "bodily injury" or "property damage," as those terms are used in the Policy. The Policy provides that "bodily injury" includes emotional harms only "if directly resulting from physical injury, sickness, or disease." Further, under the Policy, emotional injury, or any physical injury resulting therefrom, is not covered if the injured party did not directly incur physical injury from the incident. The Policy thus does not

For completeness, the Court will also address Great American's alternative contention that, even if any of the claims meet the Policy definition of an occurrence, such claims are barred by one or more Policy exclusions, including, most significantly, the "intentional acts" exclusion.[15] This provision states that coverage is not provided for:

> "Bodily Injury" or "property damage" expected or intended

---

provide coverage for purely emotional damages, or physical injuries that result solely from emotional harms. In finding that Douglas and Hooper suffered damages as a result of William's negligent handling of a corpse, the jury concluded that they suffered emotional harm and physical manifestations of this emotional harm. Because there are no allegations that William directly caused physical harm to Douglas and Hooper, they did not suffer a "bodily injury" and thus the Policy provides no coverage. See Allstate Ins. Co. v. Clohessy, 32 F. Supp.2d 1333, 1336 (M.D. Fla. 1998)(holding that the term "bodily injury," when used in an insurance policy, applies only to physical harm).

Douglas and Hooper have alternatively characterized William's liability for negligent handling of a corpse as arising from "interruption of the limited property rights of disposition." Doc. 47 at 8. Under the terms of the Policy, however, "property damage" refers to damage to "tangible property," and thus interference with Douglas and Hooper's intangible rights of disposition would not qualify as "property damage."

Moreover, William's liability for negligent diminution of property value did not arise from "property damage," as that term is used in the Policy. "Property Damage" is defined as "physical injury to tangible property" or "loss of use of tangible property." Simply put, "property damage" does not include a diminution in economic value that is not caused by physical injury or some loss of use. Here, there are no allegations that the property was physically damaged or that it is no longer suitable for any particular use. William's liability for negligent diminution in value is thus not covered under the Policy. See Lazzara Oil Co. v. Columbia Casualty Co., 683 F. Supp. 777, 780 (M.D. Fla. 1988)("[P]ure economic losses do not constitute damage or injury to tangible property."); Old Republic Insurance Co. v. West Flagler Associates, Ltd., 419 So.2d 1174, 1177-78 (Fla. 3d DCA 1982)(finding no "property damage" because "[o]nly the tickets' economic value, i.e., an intangible, was alleged to have been diminished").

[15] Although Great American also argues that the Policy's "pollution exception" bars any coverage for William's liability for negligent diminution in property value, given the Court's rulings on coverage and the intentional acts exclusion, this Order need not address this argument.

13

>           from the standpoint of the "insured," even if the resulting
>           "bodily injury" or "property damage:"
>
>                   (1) Is of a different kind, quality, or degree than initially
>           expected or intended; or
>
>                   (2) <u>Is sustained by a different person</u>, entity, real or
>           personal property, than initially expected or intended.

Doc. 1, Ex. B at 2 (emphasis added). Generally, under such intentional act exclusions, "coverage is not excluded as a matter of law where there was an 'intentional act' but not an 'intentionally caused' injury." Cloud v. Shelby Mut. Ins. Co. of Shelby, Ohio, 248 So.2d 217, 218 (Fla. 3d DCA 1971). Great American thus must demonstrate that William expected or intended to cause injury through his actions. However, so long as William intended to cause bodily injury or property damage of some kind, all resulting injuries are excluded from coverage, even if such damage is "sustained by a different person . . . than initially expected or intended." Doc. 1, Ex. B at 2.[16]

Although there is no direct evidence that William specifically intended to harm Douglas and Hooper, there is no doubt that William intended to cause "'bodily injury' or 'property damage'" to his mother. See, e.g., Doc. 47 at 14.[17] Under the terms of the

---

[16] Although Douglas and Hooper assert that the exclusion would have applied only if there was evidence that William acted with the specific intent to harm them and their property interests, the language of the Policy refutes this contention. The Policy specifically excludes coverage for harms "different in kind . . . than initially expected . . . or . . . sustained by a different person . . . than initially expected or intended." Id.

[17] This case is thus distinguishable from cases such as Prudential Property and Casualty Insurance Co. v. Swindal, 622 So.2d 467 (Fla. 1993), where the court found that the exclusionary clause would not apply if the insured had not expected or intended to cause harm through his tortious behavior.

exclusion, therefore, any other harm resulting from his actions is excluded under the clause, even if that harm is different in kind or suffered by a different person than was initially intended or expected.[18] The clause thus excludes any coverage for the damages suffered by Douglas and Hooper, because such harm was the result of William intentionally causing bodily harm and property damage to his (and their) mother.[19] Therefore, even if William's conduct was otherwise covered under the Policy, the intentional acts exclusion would relieve Great American of any duty to indemnify in this case.[20]

---

[18] Although some Florida courts have held that clauses which exclude coverage for expected or intended damage apply only when the insured specifically intended to harm the injured party, see Spengler v. State Farm Fire & Casualty Co., 568 So.2d 1293, (Fla. 1st DCA 1990); but see Peters v. Trousclair, 431 So.2d 296 (Fla. 1st DCA 1990), such cases involved different policy language. Here, the exclusionary clause explicitly applies to intentionally caused damages even when the damages are suffered by a person other than the insured's initial target.

[19] The jury's verdict of negligence is also inapplicable to the intentional acts exclusion. Even if William's behavior was merely negligent with respect to Douglas and Hooper, any harm caused by his conduct is excluded from coverage under the terms of the Policy because his actions were intentional with respect to his mother.

[20] In an order dated July 23, 2009, in the underlying litigation, Judge Fina stated that "none of the claims asserted by Plaintiffs, Douglas Elliot and Mary Ann Hooper in this action fall within the intentional exclusion asserted by Great American in the federal Declaratory action." See Doc. 73 at 10. Although Douglas and Hooper contend that Judge Fina's statements are "res judicata" as to this issue (Doc. 73 at 11), Great American intervened in the state case only for the limited purpose of filing a motion to stay the proceedings. Id. Great American thus had no opportunity to litigate whether the exclusion applied. Moreover, the hearing took place prior to trial, and thus Judge Fina's determination solely related to Great America's motion to stay and was not a final determination of Great American's obligations under the Policy.

Douglas and Hooper further contend that the Rooker-Feldman doctrine should bar review of Judge Fina's order. Under the Rooker-Feldman doctrine, "a United States District Court has no authority to review final judgments of a state court in judicial proceedings. . . . The doctrine applies not only to claims actually raised in the state court, but also to claims

Accordingly, it is hereby

**ORDERED**:

1. Great American's Motion for Summary Judgment on the Duty to Indemnify (Doc. 42) is **GRANTED** on all counts of the Complaint (Doc. 1).[21] Great American has no duty to indemnify William Robert Elliott for his liability in the underlying civil litigation.

2. Great American's Motion to Strike (Doc. 77) is **DENIED AS MOOT**.

3. The Clerk shall enter a declaratory judgment that Great American Assurance Company has no duty under its Agripak Farm and Ranch Policy to indemnify William Robert Elliott for his intentional actions which resulted in damages to Mary Ann Hooper and Douglas Elliott. Therefore Great American Assurance Company is not liable for the jury verdict and judgment against William Robert Elliott in the underlying state court civil action.

---

that were not raised in the state court but are 'inextricably intertwined' with the state court's judgment." Powell v. Powell, 80 F.3d 464, 466 (11th Cir. 1996) (quotations omitted). However, "a claim that [a party] had no opportunity to raise in state court cannot be barred by Rooker-Feldman." Torchia v. State of Fla. Office on Fin. Inst. and Sec. Regulation, 168 F. App'x 922, 923 (11th Cir. 2006). Here, there is no "final judgment of a state court" because the issue of the applicability of the intentional act exclusion was not before Judge Fina and no final ruling was rendered. Moreover, Great American had no reasonable opportunity to raise its claim regarding coverage because it intervened only for the limited purpose of moving to stay the proceedings. The Rooker-Feldman doctrine is thus inapplicable.

Given the Court's determination that it is not bound by Judge Fina's July 23, 2009 Order, Great American's Motion to Strike (Doc. 77) will be denied as moot.

[21] Great American's Motion for Summary Judgment (Doc. 14) is **DENIED AS MOOT** to the extent that it seeks a declaration that there was no duty to defend.

**DONE AND ORDERED** at Jacksonville, Florida this 6th day of March, 2012.

_____
TIMOTHY J. CORRIGAN
United States District Judge

js.
Copies:
counsel of record